## LAUREN WOODWARD[1] *vs.* COMMISSIONER OF SOCIAL SECURITY.

Suffolk. September 6, 2001. - January 2, 2002.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, COWIN, SOSMAN, & CORDY, JJ.

*Devise and Legacy,* Intestacy, Issue.

· This court concluded that a child resulting from posthumous reproduction might enjoy the inheritance rights of "issue" under the Massachusetts intestacy statute, where the surviving parent or the child's other legal representative demonstrated a genetic relationship between the child and the decedent, and where the surviving parent or representative established that the decedent affirmatively consented both to posthumous conception and to the support of any resulting child, but even where such circumstances existed, time limitations might preclude commencing a claim for succession rights on behalf of a posthumously conceived child. [537-538, 556-557]

Discussion of the Massachusetts intestacy statute, which does not define "issue" and does not contain an express, affirmative requirement that posthumous children must "be in existence" as of the date of the decedent's death. [542-545]

This court concluded that, given the Legislature's repeated and forceful expression of its will that all children be entitled to the same rights and protections of the law regardless of the accidents of their birth, and given the Legislature's affirmative support of assistive reproductive technologies, the Legislature intended that posthumously conceived children should be entitled, in so far as possible, to the same rights and protections of the law as children conceived before death. [545-547]

This court concluded that posthumously conceived children must obtain a judgment of paternity as a necessary prerequisite to enjoying inheritance rights in the estate of the deceased genetic parent, but, given the procedural posture of the case, did not consider the question of the implications of a limitations period on the right of posthumously conceived children to bring claims against the intestate estate. [547-551]

In considering the implications of the State interest in honoring reproductive choices of individuals on the right of posthumously conceived children to bring claims against an intestate's estate, this court concluded that a prospective donor parent must clearly and unequivocally consent not only to posthumous reproduction but also to the support of any resulting child before such a child may make a claim against the estate [551-554];

---

[1]Lauren Woodward (wife), on her own behalf as parent and guardian and on behalf of her minor children, and as administratrix of the estate of Warren Woodward (husband).

however, the court declined to specify what proof would be sufficient to establish a successful claim [554-555].

This court concluded that a Probate and Family Court judge should not have entered a paternity judgment or ordered that a deceased husband's name be added to the birth certificates of posthumously conceived children, where notice was not given to every other interested party, and where neither the statutory powers granted to administrators of estates nor the intestacy and paternity laws permitted a procedure to establish paternity through the filing of a stipulation of voluntary acknowledgment of parentage, executed by the wife by herself as mother and by herself as administratrix of the husband's estate. [555-556]

CERTIFICATION of a question of law to the Supreme Judicial Court by the United States District Court for the District of Massachusetts.

*Thomas C. Fallon* for the plaintiff.

*George B. Henderson, II,* Assistant United States Attorney (*Karen Aviles,* of Maryland, with him) for the defendant.

MARSHALL, C.J. The United States District Court for the District of Massachusetts has certified the following question to this court. See S.J.C. Rule 1:03, as appearing in 382 Mass. 700 (1981).

> "If a married man and woman arrange for sperm to be withdrawn from the husband for the purpose of artificially impregnating the wife, and the woman is impregnated with that sperm after the man, her husband, has died, will children resulting from such pregnancy enjoy the inheritance rights of natural children under Massachusetts' law of intestate succession?"

We answer the certified question as follows: In certain limited circumstances, a child[2] resulting from posthumous reproduction may enjoy the inheritance rights of "issue" under the Massachusetts intestacy statute. These limited circumstances exist where, as a threshold matter, the surviving parent or the child's other legal representative demonstrates a genetic relationship between the child and the decedent. The survivor or representa-

---

[2]The term "natural child" (or "natural children") does not occur in any applicable Massachusetts statute. It is a term drawn from Federal legislation. See, e.g., 42 U.S.C. § 416(e) (1994) and 20 C.F.R. § 404.355 (2001) (defining the term "natural child"). Our inquiry is directed solely to the language of the applicable Massachusetts statutes.

tive must then establish both that the decedent affirmatively consented to posthumous conception and to the support of any resulting child. Even where such circumstances exist, time limitations may preclude commencing a claim for succession rights on behalf of a posthumously conceived child. Because the government has conceded that the timeliness of the wife's paternity action under our intestacy law is irrelevant to her Federal appeal, we do not address that question today.

The United States District Court judge has not asked us to determine whether the circumstances giving rise to succession rights for posthumously conceived children apply here. In addition, she has removed from our consideration the question whether the paternity judgment obtained by the wife in this case was valid. See note 6, *infra*. We answer only the certified question. See *Canal Elec. Co.* v. *Westinghouse Elec. Corp.*, 406 Mass. 369, 370 n.1 (1990); *Cabot Corp.* v. *Baddour*, 394 Mass. 720, 721 (1985).

I

The undisputed facts and relevant procedural history are as follows. In January, 1993, about three and one-half years after they were married, Lauren Woodward and Warren Woodward were informed that the husband had leukemia. At the time, the couple was childless. Advised that the husband's leukemia treatment might leave him sterile, the Woodwards arranged for a quantity of the husband's semen to be medically withdrawn and preserved, in a process commonly known as "sperm banking." The husband then underwent a bone marrow transplant. The treatment was not successful. The husband died in October, 1993, and the wife was appointed administratrix of his estate.

In October, 1995, the wife gave birth to twin girls. The children were conceived through artificial insemination using the husband's preserved semen. In January, 1996, the wife applied for two forms of Social Security survivor benefits: "child's" benefits under 42 U.S.C. § 402(d)(1) (1994 & Supp.

V 1999), and "mother's" benefits under 42 U.S.C. § 402(g)(1) (1994).[3]

The Social Security Administration (SSA) rejected the wife's claims on the ground that she had not established that the twins were the husband's "children" within the meaning of the Act.[4] In February, 1996, as she pursued a series of appeals from the SSA decision, the wife filed a "complaint for correction of birth record" in the Probate and Family Court against the clerk of the city of Beverly, seeking to add her deceased husband as the "father" on the twins' birth certificates. In October, 1996, a judge in the Probate and Family Court entered a judgment of paternity and an order to amend both birth certificates declaring the deceased husband to be the children's father. In his judgment of paternity, the Probate Court judge did not make findings of fact, other than to state that he "accepts the [s]tipulations of [v]oluntary [a]cknowledgment of [p]arentage of [the children] . . . executed by [the wife] as [m]other, and [the wife], [a]dministratrix of the [e]state of [the husband], for father." See G. L. c. 209C, § 11.[5]

The wife presented the judgment of paternity and the amended birth certificates to the SSA, but the agency remained

---

[3]At the time of his death, the husband was a fully insured individual under the United States Social Security Act (Act). Section 402(d)(1) of 42 U.S.C. provides "child's" benefits to dependent children of deceased parents who die fully insured under the Act. See 42 U.S.C. § 402(d)(1); 20 C.F.R. § 404.350. Section 402(g)(1) of 42 U.S.C. provides "mother's" benefits to the widow of an individual who died fully insured under the Act, if, inter alia, she has care of a child or children entitled to child's benefits. See 42 U.S.C. § 402(g)(1); 20 C.F.R. § 404.339 (2001). Thus, the wife's eligibility for Social Security survivor benefits hinges on her children's eligibility for such benefits.

[4]The Act defines children, in pertinent part, as the "child or legally adopted child of an individual." See 42 U.S.C. § 416(e). The term "child" includes "natural child." See 20 C.F.R. § 404.355. The Act also establishes presumptions of dependency for certain classes of children, as well as other mechanisms for establishing dependency. As stated in the certification order, the wife's "appeal centers on only one possible basis for eligibility, which is that under SSA regulations the children are eligible if they would be treated as [the husband's] natural children for the disposition of his personal property under the Massachusetts law of intestate succession. See 42 U.S.C. §§ 402(d)(3) and 416(h)(2)(A); 20 C.F.R. § 404.355(a)(1); 20 C.F.R. § 404.361(a)."

[5]The voluntary acknowledgments of parentage are not part of the certification record before us.

unpersuaded. A United States administrative law judge, hearing the wife's claims de novo, concluded, among other things, that the children did not qualify for benefits because they "are not entitled to inherit from [the husband] under the Massachusetts intestacy and paternity laws."[6] The appeals council of the SSA affirmed the administrative law judge's decision, which thus became the commissioner's final decision for purposes of judicial review. The wife appealed to the United States District Court for the District of Massachusetts, seeking a declaratory judgment to reverse the commissioner's ruling.

The United States District Court judge certified the above question to this court because "[t]he parties agree that a determination of these children's rights under the law of Massachusetts is dispositive of the case and . . . no directly applicable Massachusetts precedent exists."

II

A

We have been asked to determine the inheritance rights under Massachusetts law of children conceived from the gametes[7] of a

---

[6]The administrative law judge reasoned that the children were not "ascertainable heirs as defined by the intestacy laws of Massachusetts," because they were neither born nor in utero at the date of the husband's death and "the statutes and cases contemplated an ascertainable child, one who had been conceived prior to the father's death." He also found that the children could not inherit as the husband's children under Massachusetts intestacy law because the evidence failed to establish that the husband, before his death, either acknowledged the children as his own or intended to contribute to their support. See G. L. c. 190, § 7. Further, the administrative law judge held that the SSA was not bound by the judgment of paternity because that judgment "is not only inconsistent with Massachusetts paternity laws but also constitutes a proceeding to which the [SSA] was not a party." See Soc. Sec. Rul. 83-37c; Gray v. Richardson, 474 F.2d 1370 (6th Cir. 1973). In her certification order, the United States District Court judge affirmed that, as a matter of Federal law, the administrative law judge "was not compelled to give dispositive weight to the Probate Court judgment." She did not ask us to determine whether the paternity judgment is "inconsistent with Massachusetts paternity laws," as the administrative law judge concluded.

[7]We use the term "gamete" here to denote "[a]ny germ cell, whether ovum or spermatozoon." Stedman's Medical Dictionary 701 (26th ed. 1995).

deceased individual and his or her surviving spouse.[8] We have not previously been asked to consider whether our intestacy statute accords inheritance rights to posthumously conceived genetic children. Nor has any American court of last resort considered, in a published opinion, the question of posthumously conceived genetic children's inheritance rights under another State's intestacy laws.[9]

This case presents a narrow set of circumstances, yet the issues it raises are far reaching. Because the law regarding the rights of posthumously conceived children is unsettled, the certified question is understandably broad. Moreover, the parties have articulated extreme positions. The wife's principal argument is that, by virtue of their genetic connection with the decedent, posthumously conceived children must *always* be permitted to enjoy the inheritance rights of the deceased parent's children under our law of intestate succession. The government's principal argument is that, because posthumously conceived children are not "in being" as of the date of the parent's death, they are *always* barred from enjoying such inheritance rights.

Neither party's position is tenable. In this developing and

---

[8]Although the certified question asks us to consider an unsettled question of law concerning the paternity of children conceived from a deceased male's gametes, we see no principled reason that our conclusions should not apply equally to children posthumously conceived from a deceased female's gametes.

[9]We are aware of only two cases that have addressed, in varying degrees, the question before us. In *Hecht* v. *Superior Court*, 16 Cal. App. 4th 836 (1993), the California Court of Appeal considered, among other things, whether a decedent's sperm was "property" that could be bequeathed to his girl friend. *Id.* at 847. In answering in the affirmative, the court noted, in dicta and without elaboration, that, under the provisions of California's Probate Code, "it is unlikely that the estate would be subject to claims with respect to any such children" resulting from insemination of the girl friend with the decedent's sperm. *Id.* at 859. In *Matter of Estate of Kolacy*, 332 N.J. Super. 593 (2000), the plaintiff brought a declaratory judgment action to have her children, who were conceived after the death of her husband, declared the intestate heirs of her deceased husband in order to pursue the children's claims for survivor benefits with the Social Security Administration. A New Jersey Superior Court judge held that, in circumstances where the decedent left no estate and an adjudication of parentage did not unfairly intrude on the rights of others or cause "serious problems" with the orderly administration of estates, the children would be entitled to inherit under the State's intestacy law. *Id.* at 602.

relatively uncharted area of human relations, bright-line rules are not favored unless the applicable statute requires them. The Massachusetts intestacy statute does not. Neither the statute's "posthumous children" provision, see G. L. c. 190, § 8, nor any other provision of our intestacy law limits the class of posthumous children to those in utero at the time of the decedent's death. Cf. La. Civ. Code Ann. art. 939 (West 2000) ("A successor must exist at the death of the decedent").[10] On the other hand, with the act of procreation now separated from coitus, posthumous reproduction can occur under a variety of conditions that may conflict with the purposes of the intestacy law and implicate other firmly established State and individual interests. We look to our intestacy law to resolve these tensions.

## B

We begin our analysis with an overview of Massachusetts intestacy law. In our Commonwealth, the devolution of real and personal property in intestacy is neither a natural nor a constitutional right. It is a privilege conferred by statute. *Merchants Nat'l Bank* v. *Merchants Nat'l Bank*, 318 Mass. 563, 573 (1945). Our intestacy statute "excludes all rules of law which might otherwise be operative. It impliedly repealed all preexisting statutes and supersedes the common law." *Cassidy* v. *Truscott*, 287 Mass. 515, 521 (1934).

Section 1 of the intestacy statute directs that, if a decedent "leaves issue," such "issue" will inherit a fixed portion of his real and personal property, subject to debts and expenses, the rights of the surviving spouse, and other statutory payments not relevant here. See G. L. c. 190, § 1.[11] To answer the certified

---

[10]The cases relied on by the administrative law judge do no more than affirm the general common-law rule that heirs are fixed as of the date of death, see *National Shawmut Bank* v. *Joy*, 315 Mass. 457, 467 (1944); *Gorey* v. *Guarente*, 303 Mass. 569, 576-577 (1939), and that children born after death within the probable period of gestation may inherit as issue of the deceased parent in exception to the general rule. See *Bowen* v. *Hoxie*, 137 Mass. 527, 528-529 (1884). See also *Waverley Trust Co., petitioner*, 268 Mass. 181, 183 (1929). Our intestacy statute supersedes any Massachusetts common law in this area. See note 16, and accompanying text, *infra*.

[11]General Laws c. 190, § 2, provides that the intestate personal property of the deceased shall be divided "among the persons and in the proportions . . .

question, then, we must first determine whether the twins are the "issue" of the husband.

The intestacy statute does not define "issue." However, in the context of intestacy, the term "issue" means all lineal (genetic) descendants, and now includes both marital and non-marital[12] descendants. See generally S.M. Dunphy, Probate Law and Practice § 8.5, at 123 (2d ed. 1997 & Supp. 2001), and cases cited.[13] See also G. L. c. 4, § 7, Sixteenth ("Issue, as applied to the descent of estates, shall include all the lawful lineal descendants of the ancestor"); *Powers* v. *Wilkinson*, 399 Mass. 650, 662 (1987). The term " '[d]escendants' . . . has long been held to mean persons 'who by consanguinity trace their lineage to the designated ancestor.' " *Lockwood* v. *Adamson*, 409 Mass. 325, 329 (1991), quoting *Evarts* v. *Davis*, 348 Mass. 487, 489 (1965).

Turning to "issue" who are the nonmarital children of an intestate, the intestacy statute treats different classes of non-marital children differently based on the presumed ease of establishing their consanguinity with the deceased parent. A nonmarital child is presumptively the child of his or her mother and is entitled by virtue of this presumption to enjoy inheritance rights as her issue. G. L. c. 190, § 5. However, to enjoy inheritance rights as the issue of a deceased father, a nonmarital child,

---

prescribed for the descent of real property," subject to the limitations discussed above. General Laws c. 190, § 3, governs the distribution of real property to the decedent's "children" and their "issue," who are preferred takers over other nonspousal heirs.

[12]When not quoting directly from other sources employing different terminology, we shall use the term "nonmarital child" throughout this opinion to describe a child born to parents who are not legally married to each other. The term "nonmarital child" is less fraught with negative implications than is the traditional language of "illegitimacy" or "bastardy." As such, the term "nonmarital child" is more closely aligned with the Legislature's commitment to eradicate distinctions between the rights of children based on the circumstances of birth.

[13]Although by statute and case law adopted children are also included in the term "issue," our discussion is limited to consanguineous descendants. In certain express and very limited circumstances, the Legislature has cut off inheritance rights of biological children, but only for the purpose of grafting the children into a new family with parents from whom they can inherit in intestacy or by will. See G. L. c. 46, § 4B (child born as result of artificial insemination of wife with husband's consent is legitimate child of marriage); G. L. c. 210, § 7 (inheritance rights of adopted child).

in the absence of the father's acknowledgment of paternity or marriage to the mother, must obtain a judicial determination that he or she is the father's child. G. L. c. 190, § 7. The general purpose of such a specific adjudication requirement is to ensure that wealth passes from and to the actual family. See generally 2 T.H. Belknap, Newhall's Settlement of Estates and Fiduciary Law in Massachusetts § 24:2, at 38-42 (5th ed. 1997). We held, at a time when the means for establishing the paternity of a child were less certain than they are today, that such disparate treatment between the mother and the father of a child advanced the Legislature's interests in preventing fraudulent claims against the estate and in administering estates in an orderly fashion. See *Lowell* v. *Kowalski*, 380 Mass. 663, 668 (1980) ("distinction between rights to inherit from a natural father and rights to inherit from a natural mother may properly be based on the greater difficulty of proving paternity than of proving maternity").

The "posthumous children" provision of the intestacy statute, G. L. c. 190, § 8, is yet another expression of the Legislature's intent to preserve wealth for consanguineous descendants. That section provides that "[p]osthumous children shall be considered as living at the death of their parent." The Legislature, however, has left the term "posthumous children" undefined. The Massachusetts intestacy statute originally made no provision for after-born children. See, e.g., St. 1805, c. 90 (approved Mar. 12, 1806). Then in *Hall* v. *Hancock*, 15 Pick. 255 (1834), in the context of a will contest, this court held that a child who was presumptively in utero as of the date of the decedent's death was a child "in being" as of the date of the decedent's death "in all cases where it will be for the benefit of such child to be so considered." *Id.* at 257, 258. Two years later, the Legislature enacted the "posthumous children" provision of the intestacy statute, bringing that devolution mechanism into conformity with our decision concerning wills. See Rev. St. 1836, c. 61, § 13. Despite numerous later amendments to our intestacy laws,

the "posthumous children" provision has remained essentially unchanged for 165 years.[14]

The Massachusetts intestacy statute thus does not contain an express, affirmative requirement that posthumous children must "be in existence" as of the date of the decedent's death. The Legislature could surely have enacted such a provision had it desired to do so. Cf. La. Civ. Code Ann. art. 939 (effective July 1, 1999) (West 2000) ("A successor must exist at the death of the decedent"). See also N.D. Cent. Code Ann. 14-18-04 (Michie 1997) ("A person who dies before a conception using that person's sperm or egg is not a parent of any resulting child born of the conception"). We must therefore determine whether, under our intestacy law, there is any reason that children conceived after the decedent's death who are the decedent's direct genetic descendants — that is, children who "by consanguinity trace their lineage to the designated ancestor" — may not enjoy the same succession rights as children conceived before the decedent's death who are the decedent's direct genetic descendants. *Lockwood* v. *Adamson, supra.*

To answer that question we consider whether and to what extent such children may take as intestate heirs of the deceased genetic parent consistent with the purposes of the intestacy law, and not by any assumptions of the common law. See *Cassidy* v. *Truscott, supra* at 520-521. In the absence of express legislative directives, we construe the Legislature's purposes from statutory indicia and judicial decisions in a manner that advances the purposes of the intestacy law. *Houghton* v. *Dickinson*, 196 Mass. 389, 391 (1907).

The question whether posthumously conceived genetic children may enjoy inheritance rights under the intestacy statute implicates three powerful State interests: the best interests of children, the State's interest in the orderly administration of estates, and the reproductive rights of the genetic parent. Our task is to balance and harmonize these interests to effect the Legislature's over-all purposes.

1. First and foremost we consider the overriding legislative concern to promote the best interests of children. "The protec-

---

[14]See Gen. St. 1860, c. 91, § 12; Pub. St. 1882, c. 125, § 6 (substituting "shall be" for "are" in posthumous child statute); Rev. L. c. 133, § 6 (1902).

tion of minor children, most especially those who may be
stigmatized by their 'illegitimate' status . . . has been a
hallmark of legislative action and of the jurisprudence of this
court." *L.W.K.* v. *E.R.C.*, 432 Mass. 438, 447-448 (2000).
Repeatedly, forcefully, and unequivocally, the Legislature has
expressed its will that all children be "entitled to the same
rights and protections of the law" regardless of the accidents of
their birth. G. L. c. 209C, § 1. See G. L. c. 119, § 1 ("It is
hereby declared to be the policy of the commonwealth to direct
its efforts, first, to the strengthening and encouragement of fam-
ily life for the protection and care of children . . ."). Among
the many rights and protections vouchsafed to all children are
rights to financial support from their parents and their parents'
estates. See G. L. c. 119A, § 1 ("It is the public policy of this
commonwealth that dependent children shall be maintained, as
completely as possible, from the resources of their parents,
thereby relieving or avoiding, at least in part, the burden borne
by the citizens of the commonwealth"); G. L. c. 191, § 20
(establishing inheritance rights for pretermitted children); G. L.
c. 196, §§ 1-3 (permitting allowances from estate to widows
and minor children); G. L. c. 209C, § 14 (permitting paternity
claims to be commenced prior to birth). See also G. L. c. 190,
§§ 1-3, 5, 7-8 (intestacy rights).[15]

We also consider that some of the assistive reproductive
technologies that make posthumous reproduction possible have
been widely known and practiced for several decades. See
generally Banks, Traditional Concepts and Nontraditional
Conceptions: Social Security Survivor's Benefits for Posthu-
mously Conceived Children, 32 Loy. L.A. L. Rev. 251, 267-273
(1999). In that time, the Legislature has not acted to narrow the
broad statutory class of posthumous children to restrict
posthumously conceived children from taking in intestacy.
Moreover, the Legislature has in great measure affirmatively

---

[15]The provisions of the intestacy statute regarding paternity have been
regularly amended to broaden the class of nonmarital children eligible to suc-
ceed from their father's intestate estate. See *Houghton* v. *Dickinson*, 196
Mass. 389, 390-391 (1907). See also St. 1943, c. 72, § 1 (establishing succes-
sion rights for nonmarital child whose father's paternity has been successfully
adjudicated); St. 1980, c. 396 (establishing succession rights for nonmarital
child whose father has acknowledged paternity).

supported the assistive reproductive technologies that are the only means by which these children can come into being. See G. L. c. 46, § 4B (artificial insemination of married woman). See also G. L. c. 175, § 47H; G. L. c. 176A, § 8K; G. L. c. 176B, § 4J; G. L. c. 176G, § 4 (insurance coverage for infertility treatments). We do not impute to the Legislature the inherently irrational conclusion that assistive reproductive technologies are to be encouraged while a class of children who are the fruit of that technology are to have fewer rights and protections than other children.

In short, we cannot, absent express legislative directive, accept the commissioner's position that the historical context of G. L. c. 190, § 8, dictates as a matter of law that all posthumously conceived children are automatically barred from taking under their deceased donor parent's intestate estate. We have consistently construed statutes to effectuate the Legislature's overriding purpose to promote the welfare of all children, notwithstanding restrictive common-law rules to the contrary. See, e.g., *L.W.K.* v. *E.R.C.*, *supra* at 447; *Adoption of Tammy*, 416 Mass. 205, 210 (1993); *Powers* v. *Wilkinson*, 399 Mass. 650, 661-662 (1987); *Powers* v. *Steele*, 394 Mass. 306, 310 (1985); *Hall* v. *Hancock*, 15 Pick. 255 (1834).[16] Posthumously conceived children may not come into the world the way the majority of children do. But they are children nonetheless. We may assume that the Legislature intended that such children be "entitled," in so far as possible, "to the same rights and protections of the law" as children conceived before death. See G. L. c. 209C, § 1.

2. However, in the context of our intestacy laws, the best interests of the posthumously conceived child, while of great importance, are not in themselves conclusive. They must be balanced against other important State interests, not the least of which is the protection of children who are alive or conceived before the intestate parent's death. In an era in which serial

---

[16]The common-law rule that heirs are ascertained at the time of the decedent's death has been superseded and, in any event, has never been applied with rigid inflexibility, even outside of the context of posthumously born children. See, e.g., *Waverley Trust Co., petitioner*, 268 Mass. 181, 183-184 (1929) ("It is not an inflexible rule that under no circumstances can the heirs of a person be ascertained as of a date later than that of death").

marriages, serial families, and blended families are not uncommon, according succession rights under our intestacy laws to posthumously conceived children may, in a given case, have the potential to pit child against child and family against family. Any inheritance rights of posthumously conceived children will reduce the intestate share available to children born prior to the decedent's death. See G. L. c. 190, § 3 (1). Such considerations, among others, lead us to examine a second important legislative purpose: to provide certainty to heirs and creditors by effecting the orderly, prompt, and accurate administration of intestate estates. See generally S.M. Dunphy, Probate Law and Practice § 8.1, at 115 (2d ed. 1997).

The intestacy statute furthers the Legislature's administrative goals in two principal ways: (1) by requiring certainty of filiation between the decedent and his issue, and (2) by establishing limitations periods for the commencement of claims against the intestate estate. In answering the certified question, we must consider each of these requirements of the intestacy statute in turn.

First, as we have discussed, our intestacy law mandates that, absent the father's acknowledgment of paternity or marriage to the mother, a nonmarital child must obtain a judicial determination of paternity as a prerequisite to succeeding to a portion of the father's intestate estate. Both the United States Supreme Court and this court have long recognized that the State's strong interest in preventing fraudulent claims justifies certain disparate classifications among nonmarital children based on the relative difficulty of accurately determining a child's direct lineal ancestor. See *Lowell* v. *Kowalski*, 380 Mass. 663, 668-669 (1980). See also *Trimble* v. *Gordon*, 430 U.S. 762, 771 (1977).

Because death ends a marriage, see *Callow* v. *Thomas*, 322 Mass. 550, 555 (1948); *Rawson* v. *Rawson*, 156 Mass. 578, 580 (1892), posthumously conceived children are always nonmarital children. And because the parentage of such children can be neither acknowledged nor adjudicated prior to the decedent's death, it follows that, under the intestacy statute, posthumously conceived children must obtain a judgment of paternity as a necessary prerequisite to enjoying inheritance rights in the estate

of the deceased genetic father.[17] Although modern reproductive technologies will increase the possibility of disputed paternity claims,[18] sophisticated modern testing techniques now make the determination of genetic paternity accurate and reliable. See generally Note, Implications of DNA Technology on Posthumous Paternity Determination: Deciding the Facts When Daddy Can't Give His Opinion, 35 B.C. L. Rev. 747 (1994). See also G. L. c. 209C, § 17. Posthumous maternity is as uncertain until judicially established as is posthumous paternity, see note 17, *supra*, and neither more nor less difficult to prove. A construction of the intestacy statute that would impose greater burdens on children posthumously conceived from their father's gametes than on children posthumously conceived from their mother's gametes would run afoul of our State and Federal Constitutions, for such classifications would serve no rational State interest. See *Trimble* v. *Gordon, supra*; *Lowell* v. *Kowalski, supra.*

We now turn to the second way in which the Legislature has met its administrative goals: the establishment of a limitations period for bringing paternity claims against the intestate estate. Our discussion of this important goal, however, is necessarily circumscribed by the procedural posture of this case and by the terms of the certified question. The certification record discloses that, after one unsuccessful insemination attempt, the wife conceived using her deceased husband's sperm approximately sixteen months after his death. The children were born approximately two years after the husband's death, and the paternity action (in the form of a "complaint for correction of

[17]It is equally clear that the intestacy statute requires an adjudication of parentage regardless of whether the deceased genetic parent was male or female. The presumption of consanguinity between the nonmarital child and his or her mother expressed in G. L. c. 190, § 5, is plainly inapplicable to the circumstances of posthumous reproduction. Cf. G. L. c. 209C, § 21 (applying provisions of paternity statute "[i]nsofar as practicable" to disputes regarding maternity). See also G. L. c. 190, § 7 (referring to c. 209C).

[18]It is now possible for a child to be born by means of reproductive technologies in circumstances in which several people could claim or be claimed to be the child's legal parents: an egg donor, a sperm donor, a gestational carrier, and one or two people who are not biologically related to the child but who have arranged for the contributions of the others and who intend to raise the child. See Shapo, Matters of Life and Death: Inheritance Consequences of Reproductive Technologies, 25 Hofstra L. Rev. 1091, 1102 (1997).

birth record") was filed approximately four months after the children's birth. Both the SSA and the administrative law judge concluded that the wife and the children were not entitled to Social Security, survivor benefits because, among other things, the paternity actions were not brought within the one-year period for commencing paternity claims mandated by the intestacy statute. See G. L. c. 190, § 7.

However, in his brief to this court, the commissioner represented that he had informed the United States District Court judge that the wife "had been advised that she need not address" the timeliness issue on appeal in light of a change in Federal regulations. Specifically, the SSA has amended its regulations to read:

> "We will not apply any State inheritance law require-ment that an action to establish paternity must be taken within a specified period of time measured from the worker's death or the child's birth, or that an action to establish paternity must have been started or completed before the worker's death. . . ."

20 C.F.R. § 404.355(b)(2).[19] We understand the commissioner's representation to be a concession that the timeliness of the wife's Massachusetts paternity actions is not relevant to the Federal law question whether the wife's children will be considered the husband's "natural children" for Social Security benefits purposes, and that therefore whatever we say on this is-sue has no bearing on the wife's Federal action. We also note that the certified question does not specifically address the limitations matter and that, in their briefs to this court, the par-ties referred to the limitations question only peripherally. See also note 6, *supra*.

Nevertheless, the limitations question is inextricably tied to

---

[19]The regulation further states: "If applicable State inheritance law requires a court determination of paternity, we will not require that you obtain such a determination but will decide your paternity by using the standard of proof that the State court would use as the basis for a determination of paternity." 20 C.F.R. § 404.355(b)(2). See 20 C.F.R. § 404.355(b)(1), which provides, in pertinent part: "To decide whether you have inheritance rights as the natural child of the insured, we use the law on inheritance rights that the State courts would use to decide whether you could inherit a child's share of the insured's personal property if the insured were to die without leaving a will."

consideration of the intestacy statute's administrative goals. In the case of posthumously conceived children, the application of the one-year limitations period of G. L. c. 190, § 7 is not clear; it may pose significant burdens on the surviving parent, and consequently on the child.[20],[21] It requires, in effect, that the survivor make a decision to bear children while in the freshness of grieving. It also requires that attempts at conception succeed quickly. Cf. Commentary, Modern Reproductive Technologies: Legal Issues Concerning Cryopreservation and Posthumous Conception, 17 J. Legal Med. 547, 549 (1996) ("It takes an average of seven insemination attempts over 4.4 menstrual cycles to establish pregnancy"). Because the resolution of the time constraints question is not required here, it must await the appropriate case, should one arise.

3. Finally, the question certified to us implicates a third important State interest: to honor the reproductive choices of individuals. We need not address the wife's argument that her reproductive rights would be infringed by denying succession rights to her children under our intestacy law. Nothing in the record even remotely suggests that she was prevented by the State from choosing to conceive children using her deceased husband's semen. The husband's reproductive rights are a more complicated matter.

In *A.Z.* v. *B.Z.*, 431 Mass. 150 (2000), we considered certain issues surrounding the disposition of frozen preembryos. A woman sought to enforce written agreements between herself

---

[20]The paternity statute permits paternity actions to be commenced prior to a child's birth, see G. L. c. 209C, § 14. Thus, a Probate Court judge, in the exercise of general equity jurisdiction under G. L. c. 215, § 6, may consider a claim to establish paternity of a posthumously conceived child where such action is commenced during a pregnancy resulting from the joining of the gametes of the surviving spouse and the deceased spouse within the time period prescribed by G. L. c. 190, § 7.

[21]We reject the wife's argument that a posthumously conceived child may be considered a "creditor" whose claim has not yet "accrued" within the meaning of G. L. c. 197, § 13, until after the child's birth. Section 13 permits a creditor "whose right of action shall not accrue within one year after the date of death of the deceased" to present his or her claims "at any time before the estate is fully administered." See *Flannery* v. *Flannery*, 429 Mass. 55 (1999). Those who take by intestate succession are not "creditors." Rather, they are the heirs who receive what remains of the estate after all creditors have been paid.

and her former husband. The wife argued that these agreements permitted her to implant frozen preembryos created with the couple's gametes during the marriage, even in the event of their divorce. We declined to enforce the agreements. Persuasive to us, among other factors, was the lack of credible evidence of the husband's "true intention" regarding the disposition of the frozen preembryos, and the changed family circumstance resulting from the couple's divorce. See *id.* at 158-159. Recognizing that our laws strongly affirm the value of bodily and reproductive integrity, we held that "forced procreation is not an area amenable to judicial enforcement." *Id.* at 160. In short, *A.Z.* v. *B.Z.*, *supra*, recognized that individuals have a protected right to control the use of their gametes.

Consonant with the principles identified in *A.Z.* v. *B.Z.*, *supra*, a decedent's silence, or his equivocal indications of a desire to parent posthumously, "ought not to be construed as consent." See Schiff, Arising from the Dead: Challenges of Posthumous Procreation, 75 N.C. L. Rev. 901, 951 (1997).[22] The prospective donor parent must clearly and unequivocally consent not only to posthumous reproduction but also to the support of any resulting child. Cf. *Paternity of Cheryl*, 434 Mass. 23, 37 (2001) ("The law places on men the burden to consider carefully the permanent consequences that flow from an acknowledgment of paternity"). After the donor-parent's death, the burden rests with the surviving parent, or the posthumously conceived child's other legal representative, to prove the deceased genetic parent's affirmative consent to both requirements for posthumous parentage: posthumous reproduction and the support of any resulting child.

This two-fold consent requirement arises from the nature of alternative reproduction itself. It will not always be the case that a person elects to have his or her gametes medically preserved to create "issue" posthumously. A man, for example, may preserve his semen for myriad reasons, including, among others: to reproduce after recovery from medical treatment, to reproduce after an event that leaves him sterile, or to reproduce

---

[22]No question has arisen in this case concerning the right of the surviving wife to use the decedent husband's gametes. Cf. *Hecht* v. *Superior Court*, 16 Cal. App. 4th 836 (1993).

when his spouse has a genetic disorder or otherwise cannot have or safely bear children. That a man has medically preserved his gametes for use by his spouse thus may indicate only that he wished to reproduce after some contingency while he was alive, and not that he consented to the different circumstance of creating a child after his death. Uncertainty as to consent may be compounded by the fact that medically preserved semen can remain viable for up to ten years after it was first extracted, long after the original decision to preserve the semen has passed and when such changed circumstances as divorce, remarriage, and a second family may have intervened. See Banks, Traditional Concepts and Nontraditional Conceptions: Social Security Survivor's Benefits for Posthumously Conceived Children, 32 Loy. L.A. L. Rev. 251, 270 (1999).[23]

Such circumstances demonstrate the inadequacy of a rule that would make the mere genetic tie of the decedent to any posthumously conceived child, or the decedent's mere election to preserve gametes, sufficient to bind his intestate estate for the benefit of any posthumously conceived child. Without evidence that the deceased intestate parent affirmatively consented (1) to the posthumous reproduction and (2) to support any resulting child, a court cannot be assured that the intestacy statute's goal of fraud prevention is satisfied.

As expressed in our intestacy and paternity laws, sound public

---

[23]Of course, a man will not always medically deposit his semen in a sperm bank for the use by a spouse or other designated person. He may also deposit his semen in a sperm bank, usually in return for compensation, for use by an anonymous third party or third parties. See Chester, Freezing the Heir Apparent: A Dialogue on Postmortem Conception, Parental Responsibility, and Inheritance, 33 Hous. L. Rev. 967, 977 & n.41 (1996). The sperm donor generally signs a contract relinquishing all parental rights and responsibilities, "and the majority of states seem to protect anonymous donors at least from unwanted responsibility for their offspring." *Id.* See G. L. c. 46, § 4B. See also *R.R.* v. *M.H.*, 426 Mass. 501, 509 (1998) ("Section 4B does not comment on the rights and obligations, if any, of the biological father, although inferentially he has none"). Such protections may reflect widespread consensus that shielding donors from the responsibilities of legal parentage is necessary to encourage the socially beneficial practice of sperm donation. It may also reflect an intention to avoid the myriad complications of probate, title to property, and fragmentation of the donor's estate that might result from contrary rules. See generally Shapo, Matters of Life and Death: Inheritance Consequences of Reproductive Technologies, 25 Hofstra L. Rev. 1091, 1218 (1997).

policy dictates the requirements we have outlined above. Legal parentage imposes substantial obligations on adults for the welfare of children. Where two adults engage in the act of sexual intercourse, it is a matter of common sense and logic, expressed in well-established law, to charge them with parental responsibilities for the child who is the natural, even if unintended, consequence of their actions. Where conception results from a third-party medical procedure using a deceased person's gametes, it is entirely consistent with our laws on children, parentage, and reproductive freedom to place the burden on the surviving parent (or the posthumously conceived child's other legal representative) to demonstrate the genetic relationship of the child to the decedent and that the intestate consented both to reproduce posthumously and to support any resulting child.

## C

The certified question does not require us to specify what proof would be sufficient to establish a successful claim under our intestacy law on behalf of a posthumously conceived child. Nor have we been asked to determine whether the wife has met her burden of proof. The record reveals that the administrative law judge repeatedly requested that the wife provide objective corroboration of her claim that the husband consented to father children after his death.[24] The administrative law judge's opinion indicates that he was willing to consider "additional declara-

---

[24]In pertinent part, the factual record contains a brief affidavit that the wife submitted to the Probate Court judge in her action to amend the children's birth records, a physician's letter that was submitted in that action, and a transcript of the wife's testimony before the administrative law judge. The wife's affidavit attests only that the husband's sperm was extracted and preserved "because my husband and I wanted to have children from our union." The two-sentence notarized physician's letter, addressed to the wife's attorney, was from the director of Reproductive Endocrinology and Fertility Services of Malden Hospital. He wrote that, on February 3, 1995, the wife "had a twin pregnancy" as a result of her insemination with the husband's "frozen/thawed semen" and that "[w]e were notified that she delivered twins in October, 1995." Before the administrative law judge the wife testified only that she and the husband had discussed with doctors whether she would "be able to have children, [the husband's] children" should the husband's bone marrow transplant not succeed. At the time, the couple had been told that the husband's leukemia treatments might render him sterile, if he survived. She

tions or written statements from the decedent's family, [the wife's] family, financial records or records from the fertility institute that demonstrate any acknowledgment [of the children] made by [the husband]." Cf. *Higgins* v. *Ripley*, 16 Mass. App. Ct. 928 (1983); *Wrenn* v. *Harris*, 503 F. Supp. 223, 226-227 (D. Mass. 1980). Perhaps because the law was unsettled at the time, the wife's counsel took the position that the paternity judgment and the birth certificates were sufficient, and that no further evidence was required. In the wife's Probate Court action, however, the judge held the husband to be the "father" of the children, but did not make any specific findings to support that determination. Nor did he determine whether the husband intended to support the wife's children. Moreover, although a birth certificate is prima facie evidence of the facts recorded therein, G. L. c. 46, § 19, under our laws, genetic and legal parentage are not always coterminous. See G. L. c. 210 (adoption statute).

It is undisputed in this case that the husband is the genetic father of the wife's children. However, for the reasons stated above, that fact, in itself, cannot be sufficient to establish that the husband is the children's legal father for purposes of the devolution and distribution of his intestate property. In the United States District Court, the wife may come forward with other evidence as to her husband's consent to posthumously conceive children. She may come forward with evidence of his consent to support such children. We do not speculate as to the sufficiency of evidence she may submit at trial.

## D

We feel constrained to comment on the judgment of paternity and the issuance of the amended birth certificates. The Probate and Family Court judge should not have entered the paternity judgment, or ordered the husband's name added to the birth certificates, on the record the mother presented. The mother sought to establish her deceased husband's paternity of the twins by bringing a complaint to amend birth records against the clerk of the city of Beverly (who, according to the judgment

---

further testified that the husband "agreed" with her that "if something should happen . . . I would still be able to have his children."

of paternity, did not object to the action). Where an estate is at issue — which will always be the case where a parent is deceased — notice of the action to establish legal parentage should be given to every other interested party, including the potential heirs who would have taken but for the posthumous creation of the children. See Mass. R. Civ. P. 19 (a) (2), 365 Mass. 765 (1974) (joinder of interested persons); Mass. R. Dom. Rel. P. 19 (West 2001) (same); *Rodrigues* v. *Rodrigues*, 286 Mass. 77, 83 (1934). See also *Sondra S.* v. *Jay O.*, 126 Misc. 2d 322, 327-328 (N.Y. Fam. Ct. 1984) (proceeding to establish deceased father's paternity must be adversary proceeding, with notice given to all interested parties). In this case, no such notice was given.[25]

The record also discloses that the wife sought to bind the husband's estate for the benefit of her posthumously conceived children by filing stipulations of voluntary acknowledgment of parentage executed by herself as mother and by herself as administratrix of the husband's estate. See G. L. c. 209C, § 11. The Probate and Family Court judge should not have considered these stipulations, much less grounded his paternity judgment on them. Neither the statutory powers granted to administrators, see, e.g., G. L. c. 195, § 5A, nor the Massachusetts intestacy and paternity laws permit such procedures to establish paternity. See, e.g., G. L. c. 209C, § 11 (requiring voluntary acknowledgments of paternity to be signed by both parents).

III

For the second time this term, we have been confronted with novel questions involving the rights of children born from assistive reproductive technologies. See *Culliton* v. *Beth Israel Deaconess Med. Ctr.*, *ante* 285 (2001). As these technologies advance, the number of children they produce will continue to multiply. So, too, will the complex moral, legal, social, and

---

[25]The wife's counsel asserted in his brief and at oral argument that the SSA was notified of the wife's proceeding to establish paternity. The record is clear, however, that the SSA was formally notified of the wife's Probate Court action three months after the date of the paternity judgment, and that the SSA was never summonsed as a party in the Probate Court matter. Moreover, the certification record contains no submission in the Probate Court that there were no other interested parties.

ethical questions that surround their birth. The questions present in this case cry out for lengthy, careful examination outside the adversary process, which can only address the specific circumstances of each controversy that presents itself. They demand a comprehensive response reflecting the considered will of the people.

In the absence of statutory directives, we have answered the certified question by identifying and harmonizing the important State interests implicated therein in a manner that advances the Legislature's over-all purposes. In so doing, we conclude that limited circumstances may exist, consistent with the mandates of our Legislature, in which posthumously conceived children may enjoy the inheritance rights of "issue" under our intestacy law. These limited circumstances exist where, as a threshold matter, the surviving parent or the child's other legal representative demonstrates a genetic relationship between the child and the decedent. The survivor or representative must then establish that the decedent affirmatively consented both to posthumous conception and to the support of any resulting child. Even where such circumstances exist, time limitations may preclude commencing a claim for succession rights on behalf of a posthumously conceived child. In any action brought to establish such inheritance rights, notice must be given to all interested parties.

The Reporter of Decisions is to furnish attested copies of this opinion to the clerk of this court. The clerk in turn will transmit one copy, under the seal of this court, to the clerk of the United States District Court for the District of Massachusetts, as the answer to the question certified, and will also transmit a copy to each party.