Jane Doe[1] *vs.* XYZ Co., Inc.,[2] & another.[3]

No. 07-P-1190.

Suffolk. September 23, 2008. - September 30, 2009.

Present: McHugh, Mills, & Wolohojian, JJ.

*Probate Court,* General equity power, Judgment. *Practice, Civil,* Judgment, Interlocutory appeal.

This court dismissed, as premature, an appeal from a judgment of the Probate and Family Court, where no certification pursuant to Mass.R.Civ.P. 54(b) entered and, therefore, the judgment was not final [316]; further, this court declined to treat the notice of appeal as a petition for an interlocutory appeal, where the underlying case raised issues of first impression that potentially had broad ramifications for which legislation might be required, and where, particularly in the absence of such legislation, the record was not free enough of material uncertainty to permit resolution of those issues [316-321].

COMPLAINT in equity filed in the Suffolk Division of the Probate and Family Court Department on February 17, 2006.

The case was heard by *John M. Smoot,* J.

*Jane Doe,* pro se.

*Patience Crozier* (*Joyce Kauffman* with her) for the defendants.

McHugh, J. Jane Doe, the plaintiff, brought this equity action against the defendants XYZ Co., Inc. (XYZ), and its director, Bill Smith (Smith), seeking an order requiring them to disclose the name of a sperm donor reflected on XYZ's records as donor number D237 and whom we shall call D237. Doe claims that she was artificially inseminated in London, England, with D237's sperm and consequently bore twin daughters. She seeks disclosure of his identity so that she can institute a paternity and child sup-

---

[1]A pseudonym.

[2]A pseudonym.

[3]Bill Smith (a pseudonym).

port claim against him and so that she can obtain medical information that may be useful in treating conditions she claims her daughters have developed.

The defendants filed a motion to dismiss Doe's claim pursuant to Mass.R.Civ.P. 12(b)(1), (3), and (6), 365 Mass. 754 (1974). In a thoughtful memorandum of decision, a judge of the Probate and Family Court allowed the motion in part and denied it in part but issued no certification pursuant to Mass.R.Civ.P. 54(b), 365 Mass. 820 (1974). Consequently, the resulting judgment is not final, *ibid.*, and the appeal must be dismissed. For reasons discussed *infra*, we decline to treat the papers Doe has filed as a petition for an interlocutory appeal.

*Background.* The parties generally proceeded as if the motion were governed by Mass.R.Civ.P. 12(b)(6). The parties, however, filed affidavits supporting their respective positions, and the judge referred to those affidavits in the course of his decision. Consequently, the motion is properly viewed as a motion for summary judgment, see Mass.R.Civ.P. 12(b), and we look at the facts in the light most favorable to Doe. See, e.g., *Humphrey* v. *Byron,* 447 Mass. 322, 325 (2006).

Viewed in that light, it appears that between 1992 and 1994, D237, then a medical student in his late twenties, sold his sperm to XYZ, a sperm bank trading in Massachusetts, for resale by XYZ to women who wished to be artificially inseminated. During those years, XYZ operated an anonymous donor program under which a sperm donor signed an agreement that he would not inquire as to the identity of the persons who used his sperm and that XYZ would keep his identity "in strictest confidence." D237 signed such an agreement.[4] Typically, the purchaser of the sperm signed a reciprocal agreement in which she stated that she had no right to the donor's identity and would not try to learn that identity from any source. For reasons the record does not reveal, however, Doe never signed such an agreement.

In 1999, Doe, a United States citizen who then lived in London, contacted XYZ seeking donated sperm. She received an XYZ disclosure form containing a great deal of physical, ethnic, and

---

[4]In 1995, XYZ began a program in which donors could release their identity to biological offspring who reached eighteen years of age. The record contains no evidence that D237 signed a new agreement changing his status from an anonymous to an identity-release donor.

medical information about D237, though not his name, address, or other overtly identifying characteristics.[5] She thoroughly digested the disclosure form and relied on it in selecting D237 as a sperm donor.

Before the sale was completed, Smith says that he spoke to Doe and told her that D237's identity would remain confidential and that she would never have a right to know it. Doe says Smith told her that D237 agreed to have his identity revealed so that he could have contact with the children. Her statement in that regard contradicts D237's donor disclosure form, which says that he would not consider contact, and also contradicts the certificate filled out by the clinic where she was to be inseminated, which said that she was participating in an "anonymous donor insemination." Moreover, Doe and Smith sharply disagree about a telephone conversation of June 13, 2000, in which Smith says he reiterated D237's confidential status and Doe says Smith told her that D237 would be pleased to have contact with the children when they were born.

In addition to the importance Doe ascribes to Smith's assurances that D237 was willing to have contact with the children, Doe attached importance to his apparent Massachusetts connection.[6] As Doe put it in her affidavit,

> "I knew that a United Kingdom donor would be legally considered not to be the father of a child conceived through artificial insemination but I had been aware that the status of a foreign donor to offspring would be governed by the jurisdiction in which he donated. . . . [S]o after investigation I chose to source my donor from Massachusetts precisely because I felt that if a need arose to bring a paternity action then that action would not be foreclosed."

Doe claims that, on June 16, 2000, she underwent artificial insemination in a London hospital using D237's sperm. On

[5]Doe nevertheless gave the disclosure form to private investigators who used it to try to identify the donor. The investigators produced for Doe the name of a man whom she believes is the donor. The defendants have denied that he is.

[6]The record does not show where D237 resides or resided at the time he donated the sperm. It does contain Doe's assertions that Smith told her that D237 was a Massachusetts physician.

February 2, 2001, about seven and one-half months later, she gave birth to twins.[7]

In July, 2005, Doe asked the defendants for the identity of D237. They refused to provide it. On February 2, 2006, facing eviction proceedings in London, she flew with the twins to Massachusetts, where she intends to remain "for an indefinite period of time." Two weeks later, on February 17, 2006, she filed the complaint in this equity action in the Probate and Family Court.[8] She seeks D237's identity so that she can file an action to declare his paternity and obtain an order for child support, all pursuant to G. L. c. 209C. She also seeks genetic information that may be useful in treating a variety of disorders, including ectodermal dysplasia, from which she claims the twins are suffering and for which genetic information from both parents may be helpful in treating.[9]

On that record, the motion judge, after hearing, issued a memorandum of decision in which he stated that the Probate and Family Court had jurisdiction over actions to determine the twins' paternity and that the defendants' "roles as conception intermediaries . . . make them necessary parties to the adjudication of the Twins' paternity.[10] Given that a suit to release [D237's] identity is inextricably linked to a subsequent paternity suit, [the] Court [had] subject matter jurisdiction over" Doe's

[7]No hospital certificate is part of the record, and the defendants question whether Doe's twins are, in fact, genetically connected to D237. The twins' date of birth appears in certificates issued by the United States government. The precise insemination date, however, appears only in a memorandum of law Doe filed in the Probate and Family Court, not in her complaint (which alleges only that conception occurred in June of 2000) and not in any affidavit she filed. She does state in an affidavit that she telephoned Smith on June 13, 2000, "to check whether he had dispatched the sperm," so any insemination with D237's sperm could have taken place no earlier than that. As noted, the children were born seven and one-half months later. A Smith affidavit says that Doe informed him of her pregnancy "mere days" after XYZ shipped the sperm to her.

[8]One week after filing the action, Doe voluntarily placed the twins in the care of the Department of Children and Families.

[9]The record does not contain any physician's certificates, letters, or other documents containing a diagnosis or statement that genetic information would be helpful in treatment.

[10]Before the hearing, the judge appointed for the twins a guardian ad litem (GAL) who fully briefed the issues and participated in the hearing. The GAL, however, filed no appeal from the resulting judgment.

claim of entitlement to disclosure of D237's identity and the actual paternity determination.

Then, after clearing away some underbrush,[11] the judge ruled on the summary judgment motion. First, he dismissed that portion of the complaint that sought an order requiring disclosure of D237's identity so that Doe could file a paternity action. In a thoughtful discussion, the judge found controlling guidance in *Woodward* v. *Commissioner of Social Security*, 435 Mass. 536, 537-538 (2002), a case in which a wife conceived children through artificial insemination with sperm her deceased husband had had preserved before he died. The wife sought to have the children treated as offspring entitled to full rights to support and inheritance.

The Supreme Judicial Court in *Woodward* held that the children were entitled to such rights only if the wife could show "a genetic relationship between the child and the decedent [and] both that the decedent affirmatively consented to posthumous conception and to the support of any resulting child." *Ibid.* Here, while agreeing that, at least for summary judgment purposes, Doe had demonstrated the first two elements, the judge, though not phrasing it in these precise terms, found that the record wholly failed to create a genuine issue of material fact as to the third.

Turning to the second component of the relief Doe sought, the judge noted that D237's agreement with XYZ said that he would provide XYZ with any new genetic information that had not been detected during the screening process and would keep XYZ informed of his address over a long-term period to facilitate communications regarding such issues. For that reason, and after balancing D237's interest in privacy against the twins' need for medical information, the judge appointed a special master and charged him with (1) confirming that the children had been diagnosed with ectodermal dysplasia, (2) if they had been, establishing that D237 is the twins' father, and (3) if he is, conducting a deposition at which D237 will be required to "answer all questions and produce all documents that are needed

---

[11]The judge declined to dismiss the action for improper venue, finding that the plaintiff established Massachusetts as her domicil. Next, he declined to dismiss for failure to state a claim, finding that the plaintiff's complaint presented "a novel legal theory regarding the compelling needs of two minor children . . . under the broad banner of equity."

by the Twins' physician to formulate a complete diagnosis of the ectodermal dysplasia."

*Discussion.* As noted, no certification pursuant to Mass. R.Civ.P. 54(b) entered in the Probate and Family Court where the case remains pending.[12] Consequently, the judgment was not final and remains subject to revision at any time before final judgment enters. See *Herbert A. Sullivan, Inc.* v. *Utica Mut. Ins. Co.*, 439 Mass. 387, 401 (2003). That being the case, the appeal is premature. See *Afarian* v. *Massachusetts Elec. Co.*, 449 Mass. 257, 259 n.5 (2007) (finding appeal premature "because no final judgment entered . . . and it is not clear from the docket or record whether all claims have been finally resolved against all parties"); *Long* v. *Wickett*, 50 Mass. App. Ct. 380, 383 n.5 (2000) (same).

Although we might do so under different circumstances, we decline to treat the notice of appeal as a petition for an interlocutory appeal, see G. L. c. 231, § 118, first par., principally for three reasons, all centering on uncertainties we perceive lurking in the summary judgment record. The issues the case raises are issues of first impression and potentially, at least, have broad ramifications — indeed, ramifications that cry out for legislative treatment. In the absence of legislation, however, it is particularly important that those issues be resolved on a record that so far as possible is free from material uncertainty.

The first uncertainty has to do with the genetic link between D237 and Doe's children. Implicit in the judge's order appointing the special master is his recognition that the defendants have raised serious questions about that genetic link. See note 7, *supra.* Ordinarily, proving the link's existence or nonexistence would be an end result of the litigation, not a starting point. Doe's standing to assert every claim she has advanced,

---

[12]Rule 54(b) provides in part,

"When more than one claim for relief is presented in an action, . . . the court may direct the entry of a final judgment as to one or more but fewer than all of the claims . . . only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment. In the absence of such determination and direction, any order or other form of decision, however designated, which adjudicates fewer than all the claims . . . shall not terminate the action as to any of the claims . . . , and the order or other form of decision is subject to revision at any time before the entry of judgment adjudicating all the claims . . . ."

however, rests on the truth of her allegation that D237 is a biological parent of her children. If he is not, then she can make no colorable claim that she is entitled to learn his identity, to obtain medical information from or about him, or to learn anything else related to him.

The thoughtful process the motion judge has put in place may resolve the genetic link question. To be sure, as the order is currently framed, that process is triggered by a special master's determination that the children have been diagnosed with ectodermal dysplasia. But the order is not immutable, and the absence of any link would obviate the need for determination of any novel and serious issue the case presents. The existing order is essentially a discovery order. See Mass.R.Civ.P. 26(c), as amended, 423 Mass. 1401 (1996); Mass.R.Civ.P. 35, 365 Mass. 793 (1974). As to such orders, the judge has broad discretion. See *Solimene* v. *B. Grauel & Co., KG*, 399 Mass. 790, 799 (1987); *Buster* v. *George W. Moore, Inc.*, 438 Mass. 635, 653 (2003). If it appears desirable, therefore, the judge has the power to remove the condition on the genetic link exploration so that the potentially dispositive genetic link question can be definitively resolved before final judgment enters.[13]

The first uncertainty leads inevitably to the second, which has to do with the role, if any, D237 himself should play in this litigation. Clearly, D237's rights are at the litigation's center and its resolution may unalterably affect them. It is D237's identity and medical information Doe seeks, and it is a process for determining whether D237 is genetically linked to Doe's children that the judge has put in place. Counsel for XYZ has not entered an appearance for D237, nor does it appear that D237 has in any formal way agreed to abide by the outcome of XYZ's defensive efforts, motions, and requests. Indeed, it is not clear from the record that D237 even knows of the litigation's existence.

---

[13]That condition was a logical and minimally intrusive consequence of the judge's dismissal of the portion of Doe's complaint that sought D237's identity so that she could name him as a defendant in a paternity action. Dismissal of that claim meant that Doe's request for medical information that might be useful in treating the children's alleged ectodermal dysplasia was all that remained. Our decision neither changes that posture of the case nor precludes the judge from amending the order if he concludes that resolution of the genetic link question might produce a firm, fact-based conclusion to this litigation and a barrier to any satellite lawsuits this litigation might launch.

D237's absence from the litigation has potentially adverse consequences for him, for the parties, and for the litigation's progress. Because he is not a party, he might not be bound by the order requiring his deposition or by any request the master may make for use of his information or genetic material in determining his link to Doe's children. Conversely, D237 may think that the genetic question is the first question that ought to be resolved because it holds the promise of the most durable basis to end the litigation.[14] Moreover, although D237 may be able to use a favorable decision on paternity against Doe in any action between the two, see *Martin* v. *Ring*, 401 Mass. 59, 60-61 (1987); *Pierce* v. *Morrison Mahoney LLP*, 452 Mass. 718, 729-731 (2008), he might not be bound by a decision going the other way or, as a preliminary matter, by an order requiring XYZ to disclose his identity. See *Tuper* v. *North Adams Ambulance Serv., Inc.*, 428 Mass. 132, 134-136 (1998); *Matter of Cohen*, 435 Mass. 7, 16-17 (2001). These are not purely academic concerns. As we noted, the record does contain a genuine issue of material fact regarding Smith's alleged pre-impregnation conversations with Doe about D237's willingness to be identified as the children's genetic parent. The conflict between Doe and Smith on that score is important in two respects. First, although it appears to us that the judge's analytical matrix was correct and that, for the reasons set out in *Woodward* v. *Commissioner of Social Security*, 435 Mass. at 553, affirmative consent to support, evidence of which is entirely absent from this record, is essential to D237's obligation to provide support, D237's agreement to disclosure of his identity might make entirely unnecessary the carefully crafted process for obtaining medical information the motion judge created. His consent to disclosure of his identity, in other words, might mean that Doe would be entitled to obtain medical information from him directly, without the intervention of an intermediary.

Second, if the conflict between Doe and Smith over what Smith told Doe is resolved in Doe's favor, then the question of the appropriate remedy will arise. That remedy may well turn on whether what Smith told Doe accurately reflected D237's

---

[14]D237 may also have a personal jurisdiction defense that the defendants cannot raise on his behalf.

agreement with XYZ. What Doe claims Smith told her surely did not reflect D237's written agreement, but written agreements are sometimes subject to subsequent oral modification. See *Capitol Bank & Trust Co.* v. *Pre-Schools, Inc.*, 10 Mass. App. Ct. 907 (1980). See also *Cambridgeport Sav. Bank* v. *Boersner*, 413 Mass. 432, 439 (1992). Even if D237 did not agree to have his identity revealed, but Doe is successful in persuading a fact finder that Smith told her he did and seeks disclosure of his identity on that basis, then D237 will have a strong personal interest in insuring that any remedy for Smith's misstatement does not include an order requiring disclosure of his identity.

For those reasons, there is a serious question whether D237 is a necessary party to this action. See Mass.R.Civ.P. 19(a), 365 Mass. 765 (1974), which provides that,

> "[a] person who is subject to service of process shall be joined as a party in the action if (1) in his absence complete relief cannot be accorded among those already parties, or (2) he claims an interest relating to the subject of the action and is so situated that the disposition of the action in his absence may (i) as a practical matter impair or impede his ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of his claimed interest. If he has not been so joined, the court shall order that he be made a party. If he should join as a plaintiff but refuses to do so, he may be made a defendant."

See *Miller* v. *Cotter*, 448 Mass. 671, 685 (2007) ("judge may compel a party's joinder . . . where the party is necessary for a just adjudication"). We say "a serious question" because there may be ways to avoid D237's joinder entirely or to delay his joinder to some later and contingent stage of the litigation. As in all procedural matters, the judge has a large measure of discretion with respect to how that aspect of the litigation proceeds.[15]

---

[15]If joinder of D237 actually becomes necessary before a decision regarding disclosure of his identity, there likely are ways of effecting that joinder without disclosing his identity or, conversely, conditioning, after notice, his continued right to anonymity on his joining the litigation in a manner that safeguards his identity until a final disclosure decision is made. We recognize

Third, and finally, it is not clear to us from the record that Massachusetts law supplies the only rules of decision applicable to this controversy. We know that D237's sperm was shipped to England, where Doe claims it was used to impregnate her. We also know that all the negotiations between XYZ and Doe were carried out while Doe was in England and XYZ was in Massachusetts. And we know that Doe believed that English law did not regard someone who was solely a sperm donor as a parent of a resulting child. We do not know, however, who originated the purchase discussions; where, how, and to what extent D237 participated in the negotiations; or a number of other facts typically considered when determining what law applies to a controversy with international or multistate roots.[16]

The parties to a contract generally are free, at least within limits, to agree that Massachusetts law applies or that the law of some other jurisdiction is applicable, see, e.g., *Morris* v. *Watsco, Inc.*, 385 Mass. 672, 676-677 (1982), although, like other uncertainties in the case, the extent to which their agreement binds absent parties is unclear. The record does not reflect that the parties have done so thus far. Uncertainty about their choice and the absence of a factual basis for judicial decision-making regarding the proper choice, like the two uncertainties recited

_____

that, at oral argument, counsel for the defendants asserted that joining D237, even anonymously, would provide a disincentive to other potential gametes donors. That surely is a possibility to be weighed along with all other factors in determining whether joinder is necessary. As the motion judge noted, however, D237 "elected to participate in anonymous sperm donation knowing that his genetic contribution would affect the lives of other individuals. Therefore, his reasonable expectation of medical privacy was substantially diminished by his own conduct." Moreover, we note the obvious: the present order may already require D237's deposition. Thus, his involvement in the litigation is already a distinct possibility. As a result, any joinder disincentive is the incremental disincentive flowing from involvement in the litigation as a party as opposed to involvement as a witness.

[16]At oral argument, Doe stated that in England, a donor must specifically agree to allow an unmarried woman to use his sperm and that the defendants did not obtain such consent from D237. Further, she claimed that the defendants failed to register with the Human Fertilisation and Embryology Authority as required by United Kingdom law. It is not clear that she raised those claims in the Probate and Family Court, nor is it clear the precise effect she claims those laws have on the present controversy. Her arguments, though, highlight the multinational nature of the laws that may supply rules of decision for parts of the present controversy.

above, counsels against treating the notice of appeal as a petition for an interlocutory appeal and proceeding to decide the underlying merits of the appeal at this time.

*Appeal dismissed.*