Lu, John T., J.
INTRODUCTION
The defendant, Yovette Mumford (Mumford) is charged with one count of forgery in violation of G.L.c. 267, §1, one count of common-law forgery, three counts of uttering in violation of G.L.c. 267, §5, and three counts of common-law uttering. Mumford has moved to dismiss the indictments claiming that the grand jury did not hear enough evidence to warrant return of the indictments. See Commonwealth v. McCarthy, 385 Mass. 160 (1982).
Concluding that the fraudulent letter allegedly created and used by Mumford was the type of document to which the offenses of statutory forgery and uttering apply, that the evidence on the elements on these offenses was sufficient to warrant the indictments, that the statutes do not supersede the common law, and, finally, that the evidence on the elements of common-law forgery and uttering was adequate, the court denies the motion to dismiss.
BACKGROUND
The grand jury heard testimony that Mumford telephoned Joyce Coleman (Coleman), the Chief Probation Officer for Middlesex County, and told her that, because she was seeking financing from a bank, she needed a letter stating that she had completed the terms of her probation. Coleman provided Mumford with the letter (Letter), dated June 9, 2005. The Letter was printed on Probation Department Letterhead and bore Coleman’s signature.
In July of 2005, Mumford began the process of obtaining a loan from Northern Bank and Trust Company (Bank) to finance her purchase of the Boston Yacht Haven. The Bank investigated Mumford as part of its decision-making process, and learned that she had been convicted on tax-related issues in 2003. In response to the Bank’s inquiries on this subject, Mumford stated that the case had been dismissed. Taking Mumford at her word, the Bank loaned her over $10 million in September of 2005. The Bank’s commitment letter contained language to the effect that if Mumford made misrepresen *463 tations at any point during the loan process, she would be in “technical default,” and the Bank would have the option of demanding payment of the loan in full.
In November of 2005, an article appeared in The Boston Globe newspaper questioning how an individual who had been convicted of a crime could obtain an $11 million loan to purchase the Boston Yacht Haven. The Bank met with Mumford and, showing her the article, expressed its concerns and asked for an explanation. Mumford disputed the article’s accuracy, and the Bank requested a writing to that effect. Mumford’s attorney sent the Bank a letter that responded to the article; attached to the letter was the letter on Probation Department letterhead, purportedly signed by Coleman (Forged Letter). This Forged Letter stated that all charges against Mumford had been dismissed.
The grand jury heard testimony that, around the same time Mumford was negotiating a loan from the Bank, Machal, Inc. (Machalj, a Louisiana company, was seeking partners for its gaming project with the Jena Band of the Choctaw Indian Tribe (collectively, Tribe) in Louisiana. Mumford expressed an interest in the project and sent her financial statement to Machal’s attorney. Machal’s attorney conducted an Internet search on Mumford, and learned that she had been convicted of tax-related crimes; the Tribe could not associate with someone who had been criminally convicted. She met with Machal’s attorney and members of the Tribe in Louisiana in June of 2005 and explained that the charges had been dismissed, that she had never been convicted, and that she would provide the Tribe with documentation to that effect.
Approximately one week after the meeting, Mumford faxed the Forged Letter to Louisiana. Machal’s and the Tribe’s attorneys questioned the legitimacy of the letter given its wording and the fact that only a conviction triggers a probation department’s involvement in a case. Eventually, Machal’s attorney located the attorney from the Attorney General’s office who had been involved in Mumford’s 2003 case and learned that Mumford had indeed been convicted. Mumford made additional attempts to become involved in the Louisiana gaming project, traveling to Louisiana on several occasions, and attempting to convince the parties that she had not been convicted of a crime by showing them the Forged Letter.
The chief technology officer of Mumford’s company was the keeper of Mumford’s archived computer files. In or around December of2006, the chief technology officer discovered the Forged Letter saved among Mumford’s electronic documents and eventually brought the Forged Letter to the attention of the Probation Department and the Attorney General’s office. Coleman herself appeared before the grand jury and testified that she neither wrote nor signed the Forged Letter.
DISCUSSION
In order for the court to find that the evidence presented to the grand juiy was sufficient to warrant a finding of probable cause sufficient to indict, the Commonwealth has to have presented the grand jury with, at the veiy least, sufficient evidence to establish the identity of the accused and probable cause to arrest her. Commonwealth v. O’Dell, 392 Mass. 445, 450 (1984), citing McCarthy, 385 Mass, at 163. Probable cause to arrest requires that the facts and circumstances within the police officers’ knowledge at the time of the arrest serve as “reasonably trustworthy information sufficient to warrant a prudent man in believing that the defendant had committed or was committing an offense.” Commonwealth v. Stevens, 362 Mass. 24, 26 (1972) (quotations omitted). ‘This standard is considerably less exacting than the sufficiency of evidence required to warrant a guilty finding[,)” Commonwealth v. Colon, 431 Mass. 188, 193 (2000), and it does not require the court to review the competency or sufficiency of the evidence. Commonwealth v. Mayfield, 398 Mass. 615, 619 (1986).
I. Statutory Indictments
An individual violates G.L.c. 267, §1, if, “with intent to injure or defraud, [she] falsely makes, alters, forges or counterfeits” an enumerated document; an individual violates G.L.c. 267, §5, if, “with intent to injure or defraud, [she] utters and publishes as true a false, forged or altered record, deed, instrument or other writing mentioned in [G.L.c. 267, §1] . . . knowing the same to be false, forged, or altered . . .” Mumford has been charged with violating G.L.c. 267, §§1 and 5.
A. Type of Document
Mumford argues that the Letter she is alleged to have forged and uttered on three occasions does not fall within the types of documents to which G.L.c. 267, §§1 and 5 apply. Among the documents listed in G.L.c. 267, § 1, are “a public record, or a certificate, return or attestation of a clerk or register of a court, public register, notary public, justice of the peace, town clerk or any other public officer, in relation to a matter wherein such certificate, return or attestation may be received as legal proof...”
Clause twenly-sixth of G.L.c. 4, §7, sets forth an “expansive statutory definition of ‘public record’ ” as well as several exemptions. Georgiou v. Commissioner of Dep’t of Indus. Accidents, 67 Mass.App.Ct. 428, 432 (2006). The phrase public records “mean[s] all books, papers, maps, photographs, recorded tapes, financial statements, statistical tabulations, or other documentary materials or data, regardless of physical form or characteristics, made or received by any officer or employee of any agency, executive office, department, board, commission, bureau, division or authority of the Commonwealth . . .” G.L.c. 4, §7, Twenty-sixth. With this definition, “[pjublic records are broadly defined and include all documentaiy materials made or received by an officer or employee of any corporation or public *464 entity of the Commonwealth, unless one of [the] statutory exemptions is applicable.” Wakefield Teachers Ass’n v. School Comm. of Wakefield, 431 Mass. 792, 796 (2000), quoting Hull Mun. Lighting Plant v. Massachusetts Mun. Wholesale Elec. Co., 414 Mass. 609, 614 (1993).
The Letter fits within the scope of this broad definition as it is a document made by an officer of a department of the Commonwealth. See G.L.c. 276, §98 (“There shall be a commissioner of probation appointed by the chief justice for administration and management, who shall have executive control and supervision of the probation service and who shall devote his full-time during business hours to the duties of his office”); Massachusetts Prob. Ass’n v. Commissioner of Admin., 370 Mass. 651, 657 (1976) (“[PJrobation officers are employees of the judicial branch of government”); cf. A.L. v. Commonwealth, 402 Mass. 234, 247 (1988) (holding that Commonwealth was liable under Tort Claims Act for negligent acts of defendant probation officer); Parker v. Chief Justice of Admin. & Mgmt, 67 Mass.App.Ct. 174, 178 (2006) (“The [Chief Justice of Administration and Management] is the public employer of probation officers [for purposes ofTort Claims Act]”). The Letter is exempt from public record status, however, if it is “specifically or by necessary implication exempted from disclosure by statute[.]” G.L.c. 4, §7, Tweniy-sixth(c). Mumford asserts that G.L.c. 6, §168A, precludes the Letter from being a public record.
Sections 167 through 178B of G.L.c. 6 concern the Criminal Offender Record Information (CORI) System. The statute defines CORI as “records and data in any communicable form compiled by a criminal justice agency which concern an identifiable individual and relate to the nature or disposition of a criminal charge, an arrest, a pre-trial proceeding, other judicial proceedings, sentencing, incarceration, rehabilitation, or release.” G.L.c. 6, §167. CORI “shall not be regarded as public records and shall not be open for public inspection . . .” G.L.c. 6, §168A.
“Evaluative information” is excluded from the definition of CORI and consists of “records, data, or reports concerning individuals charged with crime and compiled by criminal justice agencies which appraise mental condition, physical condition, extent of social adjustment, rehabilitative progress and the like, and which are primarily used in connection with bail, pre-trial or post-trial release proceedings, sentencing, correctional and rehabilitative planning, probation or parole.” G.L.c. 6, §167 (emphasis added). The provisions governing the CORI System, G.L.c. 6, §§167-78, do not govern “[t]he content and use of evaluative information, and the inspection, receipt of copies and challenge of such information by an individual . . .” G.L. c. 6, § 171. Evaluative information is within the scope of public records, and “any criminal justice agency, which generates evaluative information, shall make said information available to the individual to whom it refers upon his/her writing within a reasonable period of time . . .” 803 Code Mass. Regs. §2.04(4)(a).[1]
The information in the Letter regarding Mumford’s rehabilitative progressi.e., her discharge from pro-baüonconsütutes evaluative information and not CORI. The provisions of G.L.c. 6, §§167-178, therefore do not preclude the Letter from being characterized as a public record within the scope of G.L.c. 267, §§1 and 5.[2]
Even if the Letter is not “evaluative information,” the Letter still does not fall within the scope of G.L.c. 6, §168A. The Criminal History Systems Board (Board) controls the “collection, storage, access, dissemination, content, organization, and use of [CORI].” G.L.c. 6, §168. The Board also controls “the installation, operation and maintenance of data processing and data communication systems, . . . called the [CORI] system . . . [which] shall be designed to insure the prompt collection, exchange, dissemination and distribution of such [CORI] as may be necessary for the efficient administration and operation of the criminal justice agencies .. .” Id.
Section 168A requires the commissioner of probation, among others, to “transmit to the [Board] in such form and at such times as the [B]oard shall require, detailed and complete records relative to all probation . . . cases . . . the revoking of same . . . and under the direction of the [B]oard a record shall be kept of all such cases as the [B]oard may require . .. The commissioner of probation ... shall at all times give to the [B]oard such information as may be obtained from the records concerning persons under sentence or who have been released.” G.L.c. 6, §168A. “The information obtained and recorded shall not be regarded as public records and shall not be open for public inspection but shall be accessible to the justices, the departments of probation, corrections, and youth services” and others. Id (emphasis added). The transmitted information in the hands ofi.e., obtained and recorded bythe Board is therefore not a public record pursuant to G.L.c. 6, §168A. The Letter, from the Chief Probation Officer rather than the Board, does not fall within the scope of G.L.c. 6, §168A.
Section 100 of G.L.c. 276 is consistent with this conclusion. The commissioner of probation receives the information it ultimately transmits to the Board from “[e]veiy probation officer, or the chief or senior probation officer of a court having more than one probation officer,. .. [who must] transmit to the commissioner of probation, in such form and at such times as he shall require, detailed reports regarding the work of probation in the court . . . Police officials shall cooperate with the commissioner and probation officers in obtaining and reporting information concerning persons on probation.” G.L.c. 276, §100. The commissioner of probation also receives “detailed and complete reports” from “the commissioner of correction, the penal institutions commissioner of Boston and the couniy commissioners of counties other than Suffolk . . .” Id. “The information so obtained and recorded shall not be regarded as public records and *465 shall not be open for public inspection but shall be accessible to the justices and probation officers of the courts,” and others. Id. The “information so obtained and recorded” that is not a public record refers to the information that the commissioner of probation received from the probation officers and others in the form in which the commissioner received it.
The Letter was not from the commissioner of probation but the Chief Probation Officer, and, while it was perhaps based on information that was transmitted to the commissioner of probation at some point, the Letter is not “information so obtained and received” by the commissioner of probation.
B. Remaining Elements
As the grand jury heard sufficient evidence to conclude that the Letter is a public record, the issue becomes whether the grand jury heard sufficient evidence as to the remaining elements of forgeiy and uttering to establish probable cause to arrest her. O’Dell, 392 Mass. at 450. Forgeiy, G.L.c. 267, §1, requires proof that an individual falsely made, altered, forged, or counterfeited a public record with the intent to injure or defraud; uttering, G.L.c. 267, §5, requires proof that an individual uttered and published a record that she knew to be false, forged, or altered with the intent to injure or defraud.
The grand jury heard evidence that Mumford created the Forged Letter by forging the Letter, a public record. Coleman denied writing and signing the Forged Letter, and the Forged Letter was found among Mumford’s electronic documents. The grand jury also heard evidence that Mumford provided, or uttered, the Forged Letter on three occasions: to the Bank; to Mahal and the Tribe via fax from Massachusetts and by hand in Louisiana;[3] and to The Boston Globe. See Commonwealth v. O’Connell 438 Mass. 658, 663 (2003) (“Because the evidence was sufficient to support a conviction of forgeiy as to each check, it was also sufficient to show, for purposes of the crime of uttering... both that the checks were forged, and that at the time the defendant cashed the checks, he knew or believed that the checks were forged”).
To demonstrate an intent to injure or defraud with respect to both forgery and uttering, “(t]he Commonwealth need not show that the defendant intended to injure or defraud a particular person. It is sufficient that [s]he intended to injure or defraud someone . . . [and] proof of intent to injure or defraud may be inferred from the circumstances.” Id. at 664 (citations omitted). The evidence the grand jury heard supports the conclusion that, in creating the Forged Letter and uttering it on three occasions, Mumford acted with the intent to defraud the parties to whom she uttered the Forged Letter on each of those occasions. First, if the Bank had learned of her convictions prior to financing her loan, the terms would not have been as favorable; if the Bank learned of her convictions after financing her loan, it could declare her in default and demand payment in full. Second, Machal and the Tribe did not want to associate with anyone who had been convicted of a crime and excluded Mumford from a potentially lucrative partnership. Finally, Mumford provided the Forged Letter to The Boston Globe in order to obtain positive media coverage.
The grand juiy heard sufficient evidence to establish Mumford’s identity and probable cause to arrest her for violating G.L.c. 267, §§1 and 5. O’Dell 392 Mass, at 450. Mumford’s motion to dismiss the indictments alleging statutoiy violations must be denied.
II. Common-Law Indictments
Mumford has also been charged with one count of common-law forgeiy and three counts of common-law uttering. She argues that G.L.c. 267, §§1 and 5 supersede these common-law crimes, thus the indictments must be dismissed. Alternatively, she seeks their dismissal on the basis that the grand juiy did not hear sufficient evidence of these crimes.
A. Supersession
Courts have found supersession only where the statute contradicts existing common law. See Nunez v. Carrabba’s Italian Grill, Inc., 448 Mass. 170, 176 n.6 (2007) (listing cases where court held that statute abrogated common law). For example, “(u]nder G.L.c. 233, §21, a witness’s prior criminal conviction ‘may be [admissible at trial] to affect [the witness’s] credibility.’ ” Commonwealth v. Harris, 443 Mass. 714, 720 (2005) (final alteration in original), quoting G.L.c. 233, §21. This statute, which made “certain evidence admissible, . . . superseded any prior common-law evidentiary rule excluding such evidence.” Id. at 724 n.8 (emphasis added). Similarly, “under common law before the enactment of G.L.c. 231, §85G, a parent could not be held vicariously liable for the intentional acts of his child solely on the basis of his or her status as a parent.” Kerins v. Lima, 425 Mass. 108, 111 (1997). “In enacting G.L.c. 231, §85G,... the Legislature changed this common law rule and imposed strict liability on the parent for the intentional acts of his or her child. This was a radical change in the common law.” Id. The posthumous children provision of the intestacy law, G.L.c. 190, §8, supersedes “the general common-law rule that heirs are fixed as of the date of death...” Woodward v. Commissioner of Soc., 435 Mass. 536, 542 & n.10; id. at 547 n.16 (“The common-law rule that heirs are ascertained at the time of the decedent’s death has been superseded ...”).
Here, the statutoiy crimes of forgeiy and uttering do not contradict the existing common law. First, with respect to common-law forgeiy, “to maintain an indictment for forgeiy at common law, it must appear not only that there has been a false making of a written instrument for the purpose of fraud or deceit but also that the forged instrument is of such a description that it might defraud or deceive, if used with that intent[.]” Commonwealth v. Dunleay, 157 Mass. 386, 387 (1892) (emphasis added), quoting Commonwealth v. Hinds, 101 Mass. 209, 210 (1869). Common-law forgeiy applies to any writing, whereas G.L.c. 267, §1, proscribes *466 similar conduct, but limits its application to certain writings. Commonwealth v. Apalakis, 396 Mass. 292, 298 (1985) (holdingG.L.c. 267, §1, merely “prescribes a different punishment for forgery of the limited class of writings therein enumerated”).
Second, with respect to the common-law crime of uttering, the Commonwealth must prove that the defendant knew the document he uttered was forged and that he uttered the document with the intent to defraud. Commonwealth v. Russell 156 Mass. 196, 197 (1892). Again, as the statutory crime of uttering, G.L.c. 267, §5, requires that the document be among those enumerated in G.L.c. 267, §1, the statute does not contradict the common-law crime and, consequently, does not supersede it.
To the contrary, in Commonwealth v. Ayer, the Supreme Judicial Court considered “whether the common law relating to the crime of forgery is superseded by the revised statutes, so that the present indictment cannot be maintained upon the common law.” 57 Mass. 150, 151 (1849), cited with approval in Apalakis, 396 Mass, at 298. If the statute had revised “the whole subject of forgery, . . . the common law upon that subject [would be] superseded ...” Id. at 152. The statute, however, “by no means revise[d] the whole subject of forgery, but merely prescribe[d] the punishment for certain enumerated cases of forgery.” Id. The forgery and uttering statutes in their present forms also do not revise the whole subject of forgery and uttering; rather, they limit their application to certain types of documents.
Mumford’s argument that the G.L.c. 267, §§1 and 5 supersede the common-law crimes of forgery and uttering must fail.
B. Sufficiency of Evidence
As discussed above, while the common-law crimes of forgery and uttering apply to all writings rather than certain enumerated documents, the elements are essentially the same as the elements of the statutory crimes.[4] The facts that establish probable cause to arrest on the statutory crimes also sufficiently establish probable cause with respect to the common-law crimes. Mumford’s motion to dismiss on this basis must be denied.
ORDER
The defendant Yovette Mumford’s motion to dismiss is DENIED.

It does not appear that Probation has its own regulations. Title 803 governs the Criminal History Systems Board in general, and §2.04(4) provides that “[e]ach criminal justice agency which holds evaluative information shall promulgate regulations governing the access to and dissemination of such information.” That notwithstanding, 803 Code Mass. Regs. §2.04(4)(a), quoted above, requires criminal justice agencies to make evaluative information available whenever the individual to whom the information refers requests it. The Department of Correction has promulgated regulations regarding the dissemination of evaluative information, 103 Code Mass. Regs. §157.00; the Parole Board has promulgated regulations on this subject as well, 120 Code Mass. Regs. §500.00.

This conclusion is consistent with the Office of the Commissioner of Probation’s policy, as indicated in two pamphlets available on-line. In the first pamphlet, titled “Helpful Probation Facts for Members of the Media,” the Massachusetts Office of the Commissioner of Probation states that, while the Massachusetts Probation Service is not subject to the Public Information Act, “[information on probationer status ... is available to the public. A probation spokesperson will confirm ... [that] [a] person is on Probation!;] - • • [sjpecial conditions of Probation!;] ... [and that] [a] probationer is or is not in compliance with the terms of their probation.” http://www.mass.gov/courts/pro-bation/helpfulprobationfactsmedia.pdf (last visited September 16, 2008) (emphasis added). The second pamphlet, tilled “The Probation Primer: A Guide to Massachusetts Probation Service and the Office of Community Corrections,” also provides that “[information on probationer status is provided to the press and the general public as a courtesy.” http://www.mass.gov/courts/probation/primer.pdf (last visited September 16, 2008) (bold in original). This pamphlet also lists the three pieces of information a probation spokesperson will confirm. Id. The Letter contains this information that the Office of the Commissioner of Probation provides to the public.

Mumford argues that the indictments concerning her involvement with the Louisiana gaming project cannot survive because the Forged Letter was not uttered within Massachusetts. “The elements of the crime of uttering, G.L.c. 267, §5, are ‘(1) offering as genuine; (2) an instrument; (3) known to be forged; (4) with the intent to defraud.’ ” Commonwealth v. O’Connell 438 Mass. 658, 664 n.9 (2003), quoting Commonwealth v. Levin, 11 Mass.App.Ct. 482, 496 (1981). By faxing the Forged Letter from Massachusetts, Mumford offered it to the parties in Louisiana as genuine. To the extent that Mumford argues that offering the Forged Letter to the parties in Louisiana deprives the Commonwealth of jurisdiction over her actions, the evidence before the grand jury demonstrated that Mumford’s intent to defraud the parties in Louisiana existed in Massachusetts as well as in Louisiana and that, by uttering the Forged Letter to the Louisiana parties, Mumford, a Massachusetts resident, attempted to benefit herself byjoining a lucrative partnership. Commonwealth v. Hare, 361 Mass. 263, 265 (1972) (“[I]f the State succeeds in getting the defendant within its power, the law of this Commonwealth permits prosecution of the defendant for acts done outside its borders but intended to have effect within the Commonwealth” (emphasis added)); cf. Commonwealth v. Lent 420 Mass. 764, 767, 769-70 (1995) (applying G.L.c. 277, §62, which provides, in context of murder, that “jurisdiction may exist here if a death ensued elsewhere because of non-mortal violence or injury inflicted in Massachusetts” and holding that Massachusetts had jurisdiction because, but for defendant’s having inflicted injuries in Massachusetts, victim’s death in New York would not have occurred).

Mumford’s argument that the evidence does not support the element of “prejudice” fails; prejudice is not a separate element of forgery but merely a restatement of the defrauding element. For this argument, Mumford relies on Gay v. Homer, 30 Mass. 535, 542 (1833), in which the Supreme Judicial Court held, “[t]he fraudulent alteration of a writing to the prejudice of another man’s right, is forgery at common law!,]” and Commonwealth v. Ray, 69 Mass. 441, 446 (1855), where the Supreme Judicial Court described forgery as “the counterfeiting of any writing, with a fraudulent intent, whereby another may be prejudiced . ..” The context in which these statements appear indicates that the court used “prejudice” to refer to detriment to another. See Black’s Law Dictionary, at 1198 (7th ed. 1999) (defining “prejudice” as “[d]amage or detriment to one’s legal rights or claims"). By creating the Forged Letter, Mumford attempted to defraud others, thereby acting detrimentallyor prejudiciallytowards them. See id. at 434 (defining “defraud" as “to cause injury or loss to (a person) by deceit”).